**UNITED STATES DISTRICT COURT**
**WESTERN DIVISION OF OKLAHOMA**

| | |
|---|---|
| (1) JAMES CLEM, derivatively on behalf of CHESAPEAKE ENERGY CORP., <br><br>     Plaintiff, <br><br> v. <br><br> (1) AUBREY K. MCCLENDON, <br> (2) RICHARD K. DAVIDSON, <br> (3) V. BURNS HARGIS, <br> (4) FRANK KEATING, <br> (5) CHARLES T. MAXWELL, <br> (6) DON NICKLES, <br> (7) FREDERICK B. WHITTEMORE, <br> (8) MERRILL A. MILLER, JR., and <br> (9) BREENE M. KERR, <br><br>     Defendants, <br><br> and <br><br> (10) CHESAPEAKE ENERGY CORP., <br><br>     Nominal Defendant. | Case No. <br><br><br><br><br><br><br><br><br><br> **JURY TRIAL DEMANDED** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT ALLEGING BREACH OF FIDUCIARY DUTY, WASTE AND UNJUST ENRICHMENT**

1.      Plaintiff James Clem ("Plaintiff"), on behalf of nominal defendant Chesapeake Energy Corp. ("Chesapeake" or the "Company"), brings this derivative complaint against defendants, alleging the following based on personal knowledge as to himself and his own acts, and information and belief as to all other matters based upon, *inter alia,* the investigation of Counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Chesapeake, other regulatory filings and reports, press releases and public statements issued by the Company. Plaintiff

brings these claims to remedy defendants' breaches of fiduciary duties and unjust enrichment from January 2008 to the present (the "Relevant Period").

## NATURE OF THE ACTION

2.     According to its public filings, Chesapeake is a natural gas producer and regularly explores for new gas reserves. Chesapeake claims to be the second-largest producer of natural gas in the United States, and is headquartered in Oklahoma City, Oklahoma. Chesapeake conducted an initial public offering in 1993 and has remained a public company since that time.

3.     During the Relevant Period, defendants breached their fiduciary duties by allowing Chesapeake's Chief Executive Officer ("CEO"), Chairman of the Board of Directors and largest individual shareholder (formerly), Defendant Aubrey Kerr McClendon, to reap personal profits at the expense of Chesapeake and its shareholders.

4.     Chesapeake offered its Company founders, including Defendant McClendon, the opportunity to participate in a program called "Founder Well Participation Program" ("FWPP"). This program allowed Defendant McClendon to personally participate in the Company's exploratory efforts and to seek personal benefits from that participation in addition to the benefits he obtained by serving as Chesapeake's lead executive.

5.     According to Chesapeake, this program was designed to align its founders' interests with the Company, and to motivate them to continue to explore for natural gas. Defendant McClendon actively participated in this program throughout the Relevant Period.  As a result of his participation, Defendant McClendon was able to obtain

- 2 -

ownership interests in gas producing reserves valued at more than $190 million.

6.     Throughout much of the Relevant Period Defendant McClendon was Chesapeake's largest shareholder.  According to a Form 4 Defendant McClendon filed with the SEC on October 2, 2008, he owned 33,454,424 shares of Chesapeake stock. During the Relevant Period, Defendant McClendon stated he never sold shares on the open market.  However, what Defendant McClendon knew but investors did not was that he, in fact, had leveraged most of his personally held shares of Chesapeake stock and used them as collateral in an assortment of borrowing arrangements.  When the value of Company stock dropped dramatically following its unimpressive 2008 fiscal performance, Defendant McClendon was faced with a "forced liquidation" of his holdings of Chesapeake stock.  In fact, between October 8 and October 10, 2008, Chesapeake's stock value fell resulting in a margin calls for 94% of Defendant McClendon's personal holdings.

7.     This dramatic decrease in Chesapeake share value threatened Defendant McClendon's participation in the FWPP.  Defendant McClendon, in order to participate in the FWPP during any given Participation Period, was required first to state his intention to do so and to declare "the percentage working interest which the Founder proposes to participate with during such Participation Period," not to exceed 2.5% of the total.  Thereafter, the Company would invoice Defendant McClendon on a monthly basis for a *pro rata* portion of certain costs associated with drilling the applicable well. Defendant McClendon's ability to fulfill his financial obligations under the FWPP was in jeopardy following the forced liquidation of his holdings.

- 3 -

8.     Faced with these personal financial problems, Defendant McClendon recommended the Board approve a massive annual compensation increase for himself even though the Company performed very poorly in 2008.   The Board accepted Defendant McClendon's recommendation and awarded him $75 million as a "well cost incentive award," notwithstanding the Company's poor performance and the fact Defendant McClendon's employment was governed by an employment contract.  This bonus was structured as a credit toward Defendant McClendon's future obligations to pay costs associated with his participation in the FWPP.  This award was structured such that Defendant McClendon could apply the credit to costs through 2014, with any remaining funds to be paid in cash.  However, Defendant McClendon applied the full amount of the bonus to his FWPP costs by March 31, 2009.

9.     In addition to the $75 million well cost incentive bonus, Defendant McClendon's bailout included the purchase of his personal art collection for $12.1 million as part of his 2008 compensation. Neither the Compensation Committee nor the Audit Committee fulfilled their obligations to Chesapeake and its shareholders in approving the purchase as the Company admits it relied solely on the art dealer who advised Defendant McClendon on the initial purchases to value the collection.  By failing to independently determine the value of the art collection the members of the Audit and Compensation Committees did not fully inform themselves of the relevant facts - a decision which was made even more egregious by the difficult financial conditions Chesapeake faced in 2008.

- 4 -

10.     Chesapeake shareholders were immediately enraged by the compensation decisions made by the Board in a year they saw the value of their holdings fall dramatically.   On January 2, 2008 (the first trading day of the year and the beginning of the Relevant Period), Chesapeake shares closed at $40.01.  On July 2, 2008, Chesapeake shares reached an all time high of $74 and closed at $69.40.  By, December 4, 2008, Chesapeake shares had fallen to just $11.42 and on December 31, 2008, shares closed at $16.17.

11.     Shareholder efforts to reassert control over the Board have been met with intense resistance by the Board.  Indeed, shareholders have repeatedly put forth proposed corporate governance changes designed to give investors a greater say over the Board and decisions regarding executive compensation.  The Board, however, refused to implement these shareholder proposals - which have included, among other things, prohibitions on trading Company stock on margin and a requirement that executive compensation be subject to shareholder advisory votes.

12.     Plaintiff, through this action, seeks to remedy these breaches of fiduciary duty on the part of Defendant McClendon and certain members of the Board of Directors, and to return to the Company the money that was wrongfully taken from Chesapeake's coffers and paid to its chief executive in the form of an unwarranted personal bailout.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive

- 5 -

action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Chesapeake maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Chesapeake occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

16.     Plaintiff is a current shareholder of Chesapeake and has continuously held Chesapeake at the times relevant to the wrongdoing asserted herein.  Plaintiff is a resident of California.

17.     Nominal defendant Chesapeake is an Oklahoma corporation headquartered in Oklahoma City, Oklahoma.

- 6 -

18.    Defendant McClendon has served as CEO and Chairman of the Board since 1989 and is a resident of Oklahoma.

19.    Defendant Richard K. Davidson ("Davidson") has served as a director of the Company since March 2006. Defendant Davidson currently serves on Chesapeake's Audit Committee. Davidson is a resident of Florida.

20.    Defendant V. Burns Hargis ("Hargis") has served as a director of the Company since September 2008. Defendant Hargis currently serves as chairman of Chesapeake's Audit Committee and served as an Audit Committee member during the Relevant Period. Hargis is a resident of Oklahoma.

21.    Defendant Frank Keating ("Keating") has served as a director of the Company since June 2003. Defendant Keating was a member of the Compensation Committee throughout the Relevant Period. Keating is a resident of Virginia.

22.    Defendant Charles T. Maxwell ("Maxwell") has served as a director of the Company since 2002. Defendant Maxwell currently serves on Chesapeake's Compensation Committee and its Nominating and Corporate Governance Committee. Maxwell is a resident of New York.

23.    Defendant Merrill A. "Pete" Miller ("Miller") has served as a director of the Company since January 2007. Defendant Miller currently serves on Chesapeake's Audit Committee. Miller is a resident of Texas.

24.    Defendant Don L. Nickles ("Nickles") has served as a director of the Company since January 2005. Defendant Nickles currently serves as chairman of Chesapeake's Compensation Committee. Nickles is a resident of Virginia.

25.    Defendant Fredrick B. Whittemore ("Whittemore") served as a director of the Company from 1993 until June, 2011.   Defendant Whittemore served on Chesapeake's Compensation Committee and its Nominating and Corporate Governance Committee. Whittemore is a resident of New York.

26.    Defendant Breene M. Kerr served as a director of Company from 1993 until June 12, 2009, and was Chairman of the Audit Committee at the time of his resignation from the Board.   Kerr is a citizen of Maine.

27.    Collectively, defendants McClendon, Davidson, Hargis, Kerr, Keating, Maxwell, Miller, Nickles, Whittemore and Kerr shall be referred to herein as "Defendants" or the "Relevant Board."

28.    Collectively, defendants Kerr, Davidson, Hargis, and Miller shall be referred to as "Audit Committee Defendants."

29.    Collectively, defendants, Keating, Maxwell and Whittemore shall be referred to as "Compensation Committee Defendants."

### DEFENDANTS' FIDUCIARY DUTIES

30.    By reason of the defendants' positions with the Company as officers and/or directors, said individuals owe fiduciary duties to Chesapeake and its public stockholders including duties of good faith, fair dealing, loyalty and full, candid and adequate disclosure.

31.    As corporate directors, defendants are required to act in good faith, in the best interests of a corporation's shareholders and with such care, including reasonable

- 8 -

inquiry, as would be expected of an ordinarily prudent person. Each director and officer of the Company owes to Chesapeake and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

32.     In accordance with their duties of loyalty and good faith, Defendants, as directors and/or officers of Chesapeake, are obligated to refrain from:

A.     participating in any act or transaction where the directors' or officers' loyalties are divided;

B.     using their positions of control to harm Chesapeake or extract personal financial benefits not equally shared by the public shareholders of the corporation; or

C.     unjustly entrenching or enriching themselves at the expense or to the detriment of Chesapeake's public shareholders.

33.     Defendants, aided and abetted by each other, have violated the fiduciary duties owed to the Company and its shareholders, including their duties of loyalty and good faith, by providing Defendant McClendon a personal bailout that rewarded unreasonable risk taking and did not provide any benefit the Company.

## SUBSTANTIVE ALLEGATIONS

### Founders Well Participation Program

34.     Chesapeake was founded in 1989 by Defendant McClendon and Tom L. Ward. Chesapeake's stated objective was to "build a sizable natural gas exploration and production company through the application of new technologies, primarily horizontal drilling." Chesapeake obtained various leasehold positions in Oklahoma and Texas

before going public in 1993. The Company continued to grow throughout the 1990s and early 2000s before experiencing its worst financial results ever in 2008.

35.      Chesapeake maintains a program known as the Founder Well Participation Program ("FWPP"), which the Company describes as "a continuation of the well participation program (the "FWPP") initiated by Chesapeake Energy Corporation (the "Company") for Aubrey K. McClendon and Tom L. Ward (the "Founders") in connection with the Company's initial public offering in February 1993." Chesapeake claims this program provides benefits to the Company by "retaining and motivating the principal executive officers who founded the company" by "aligning the financial rewards and risks of the Founders with the Company..." and by "imposing on the Founders the same risk incurred by the Company in its core operations."

36.      To participate in the FWPP, Defendant McClendon was required to pay a portion of certain costs associated with the wells being drilled by the Company in any given year. In exchange for his contribution, Defendant McClendon received a portion of the revenue generated from the wells. The FWPP limited McClendon's participation to 2.5% interest in any given well, and required McClendon to reduce his interest any time the Company's working interest dropped below 12.5% on any well in which he participated.     Defendant McClendon regularly took advantage of the program by participating in every well from the Company's IPO in 1993, except for a period between January 1999 and March 31, 2000. According to Chesapeake's Schedule 14A filed with the SEC on April 20, 2009, Defendant McClendon's estimated fair value of his interest in the wells was approximately $191 million.

**Defendant McClendon Leverages His Personal Stock Holdings**

37.     During the Relevant Period, Defendant McClendon publicly stated that he never sold Chesapeake shares and, according to SEC filings, he was also the Company's largest shareholder as of July 2008.   At that time, Chesapeake stock prices reached all time highs - closing at $69.40 on July 2, 2008 after reaching $74 per share during trading.

38.     Instead of selling his Chesapeake shares, Defendant McClendon used the value of his holdings as collateral for loans he received from various lenders including, among others, Goldman, Sachs & Co. and Lehman Brothers.  The terms of the loan agreements stated that if the value of the collateral fell below certain thresholds, the lender has the option of calling the loan and causing the involuntarily liquidation of the collateral ⋅ which in Defendant McClendon's case meant the involuntary sale of the Chesapeake stock he posted as collateral for his personal loans.   As long as the collateral's value remained above that minimum threshold, he could continue to repay the loan on the terms provided by the lender.

39.     Unfortunately for Defendant McClendon, Chesapeake and its shareholders, the value of Company stock dropped dramatically throughout the second half of 2008.  In 2008, Chesapeake's earnings per share fell more than 56%, dropping from $2.69 in 2007 to $1.16 in 2008, and its net income fell from $1.45 billion in 2007 to just $723 million in 2008.  Chesapeake lost $860 million in the 4Q08.  As a result, the Company's stock price plummeted from its all-time highs to as low as $9.84 on December 5, 2008.  The SEC even became interested in the Company's performance as it acknowledged facing liquidity problems at a time when natural gas prices were at all time highs in mid-2008.

Chesapeake's 2008 performance was dramatically worse than its closest competitors.

40.    The value of Defendant McClendon's personal holdings fell in step with the Company's stock price, and on October 8, 2008, he received the first of 3 margin calls on the personal loans for which he used Chesapeake shares as collateral. On that day, more than $111 million of his personal holdings were involuntarily liquidated. The next day, October 9, 2008, another margin call resulted in the liquidation of more than $274 million worth of McClendon's Chesapeake stock. Finally, on October 10, 2008, Defendant McClendon received the last margin call resulting in the sale of over $258 million worth of Company stock. When the dust settled the damage to McClendon's personal holdings was done as 31,522,923 shares of Chesapeake stock had flooded the market. The proceeds from the three days of sales were $643,900,909.

### Defendant McClendon Receives A Personal Bailout

41.    On May 30, 2008, Chesapeake received a letter from the SEC requesting information relating to, *inter alia,* the benefits Defendant McClendon receives from participation in the FWPP and issues the Company faced with liquidity. The Company, in response, stated that it was not obligated to disclose additional information about Defendant McClendon's benefits from participation in the FWPP due to the nature of the relationship (*i.e.* "After the company assigns an interest in an oil and natural gas lease to Mr. McClendon pursuant to the FWPP, Mr. McClendon and the company become joint working interest owners in that lease.").

42.    With regard to the SEC's liquidity and capital resources concerns, Chesapeake responded by disclosing, among other things, that it increased its credit

limits, intended to raise additional capital through "various asset monetization transactions" and sold "oil and natural gas properties which we expect will generate over $1.5 billion in proceeds." The Company also expected at the time to complete a public offering to raise funds to accelerate the drilling activities.[1]

43. Notwithstanding the Company's poor financial performance in 2008, its falling stock price, and the liquidity concerns that caused it to extend its credit lines and sell off assets, on December 31, 2008, the Board revised Defendant McClendon's employment agreement to provide him with an additional $75 million incentive award. The renegotiation occurred in the first year of a five-year employment contract that Mr. McClendon signed previously and resulted in a staggering increase in his 2008 annual pay. In fact, the $75 million award McClendon received constituted a more than 400 percent increase in total compensation compared to 2007 and a 4000 percent increase in bonus consideration. The $75 million award was structured as a net credit against future billings from the Company for well costs owed by McClendon under the FWPP. The incentive award was set forth as an after-tax credit of $43.5 million toward McClendon's costs in the FWPP (which may be paid in cash to McClendon at year-end 2014 if not fully utilized). However, Defendant McClendon had fully applied to the credit to his FWPP costs by March 31, 2009.

44. The compensation awarded McClendon far exceeded previous years even though the Company itself performed poorly. The following chart shows Defendant

---

[1] A planned secondary offering was eventually cancelled, and Defendant McClendon publically apologized for the dilution in stock value that the planned sale of equities caused.

McClendon's annual compensation for the last five years:

| Year | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total Compensation |
|------|--------|-------|--------------|---------------|------------------------|--------------------|
| 2009 | $975,000 | $1,951,000 | $14,049,200 | — | $1,576,096 | $18,551,296 |
| 2008 | $975,000 | $76,951,000 | $20,342,384 | — | $1,800,817 | $100,069,201 |
| 2007 | $975,000 | $1,826,000 | $14,398,233 | $294,020 | $1,271,231 | $18,764,484 |
| 2006 | $975,000 | $1,581,000 | $9,288,550 | $1,412,612 | $1,819,698 | $15,076,860 |
| 2005 | $925,000 | $1,326,000 | $14,364,800 | — | $1,016,710 | $17,632,510 |

45.     The extreme increase in compensation occurred in a year the Company performed below industry standards. Yet, Defendant McClendon received in excess of $100 million in compensation, is over five times more than the second highest annual compensation he received.

46.     The reason for such an outlandish departure from past practices can only be realistically described as a personal bailout. The Company effectively acknowledged that the $75 million was a bailout to allow Defendant McClendon to continue his participation in the FWPP even though he over-leveraged himself by committing the vast majority of his Chesapeake holdings as collateral for personal loans as the $75 million award was designated a "well incentive award." The Company, in a letter to The Daily Oklahoman, sought to cast a positive light on the egregious award by noting Defendant McClendon was "required" to invest the net award in the FWPP, but this requirement    and Defendant McClendon's rapid use of the credit - merely confirms the payment's status as a bailout. Further, this bonus structure conflicts with the Company's prior response to the SEC wherein Chesapeake claimed it was not obligated to disclose additional information about the benefits received by Defendant McClendon due in part to the fact he was obligated to fund his own costs associated with the FWPP.

47.   With similarities to major US banks, Defendant McClendon overextended himself at a time the company he managed performed poorly relative to its historical standards and its closest competitors, and instead of being forced to accept the consequences of the risks he assumed (and presumably benefited from before his margin calls), he received an outrageously large gift in exchange for performing the duties of his executive office.

48.   At the time of his bailout Defendant McClendon was in the first year of five year employment contract. Thus, the Board's claimed benefit of continued employment for 5 years is illusory.[2]   In fact, the term of McClendon's employment was simply extended 1 year. Likewise, the Board's claim that the Company benefits from "freezing [McClendon's] salary and cash bonus awards" is misleading as demonstrated by his 2009 compensation (which is the most recent year available) wherein he was paid $18,551,296, which is more than he was paid in 2005 and 2006, and just $213,188 less than his 2007 compensation. Further, the salary freeze removes incentive for Defendant McClendon to maximize corporate profits because he will not receive any results-based increase in his compensation.

49.   The Board also claims the Company benefited   from Defendant McClendon's "origination, negotiation and closing of four transactions that delivered to the Company $10.3 billion in proceeds and $8.7 billion in economic gain" without even

---

[2] Notably, the prior iteration of Defendant McClendon's employment agreement required he maintain Chesapeake stock holdings worth at least five times his annual compensation. That requirement was lowered to 200 percent by the amended employment contract. Thus, Defendant McClendon was further bailed out in an amount equal to 3 times his annual compensation as he did not have to repurchase Company stock in that amount to satisfy the ownership requirement.

attempting to explain how this "benefit" was anything other than the result of efforts Defendant McClendon already was being paid for though his employment agreement. Defendant McClendon's prior employment agreement already obligated him to use his best efforts to assist the Company in achieving profitable operations. The Board's *ex post facto* modification of Defendant McClendon's employment agreement in a year the company dramatically underperformed cannot be a reasonable exercise of business judgment.

50.    The Board's personal bailout of McClendon did not stop with the excessive bonus award. Indeed, Defendant McClendon's new employment agreement included a provision whereby the Company would purchase Defendant McClendon's personal art collection for more than $12 million. The Board approved the purchase even though the art had been hanging in the corporate offices of Chesapeake for "a number of years." By their own admission, the Board approved this purchase on the advice of the art dealer that assisted Defendant McClendon in selecting the artwork (which included "historical antique maps of the American Southwest"). The only reasonable explanation for the timing of the Board's decision is that they understood McClendon suffered significant financial losses and this was an opportunity to provide him more corporate assets as a bailout.

### Defendant McClendon's Compensation Greatly Exceeds His Peers

51.    According to Chesapeake's Definitive Proxy filed on April 30, 2009, the Company's executives received the following compensation:

| | Year | Salary | Bonus | Stock Awards | Option Awards | All Other Comp | Total Comp |
|---|---|---|---|---|---|---|---|
| Rowland; EVP - Finance and CFO | 2008 | $844,769 | $1,331,000 | $5,976,985 | — | $1,164,406 | $9,317,160 |
| | 2007 | $787,500 | $1,201,000 | $9,371,017 | $35,200 | $941,855 | $12,336,572 |
| | 2006 | $675,000 | $1,051,000 | $2,016,652 | $164,794 | $679,841 | $4,587,287 |
| Dixon; EVP Operations and COO | 2008 | $844,769 | $1,331,000 | $4,209,405 | — | $664,571 | $7,049,745 |
| | 2007 | $787,500 | $1,201,000 | $2,442,059 | $21,104 | $579,431 | $5,031,094 |
| | 2006 | $671,875 | $1,053,986 | $966,919 | $98,130 | $384,512 | $3,175,422 |
| Jacobson; EVP - Acquisitions and Divestitures | 2008 | $787,308 | $1,151,000 | $9,668,499 | — | $482,920 | $12,089,727 |
| | 2007 | $737,500 | $1,001,000 | $3,789,447 | $18,686 | $449,998 | $5,996,631 |
| | 2006 | $637,500 | $851,000 | $974,154 | $81,340 | $302,032 | $2,846,026 |
| Lester; EVP - Exploration | 2008 | $762,365 | $1,066,250 | $5,403,174 | — | $540,954 | $7,772,743 |
| | 2007 | $732,500 | $966,000 | $7,203,335 | $21,104 | $475,952 | $9,398,891 |
| | 2006 | $637,500 | $851,000 | $1,322,385 | $98,130 | $376,156 | $3,285,171 |

52.     As the chart reveals, the combined salaries of the four next highest paid Company executives made just a fraction of the compensation paid to Defendant McClendon in 2008. In that year, Marcus C. Rowland, Chesapeake's Chief Financial Officer, received $9,317,160, Steven C. Dixon, an Executive President and the Chief Operating Officer, received 7,049,745, Douglas J. Jacobson, an Executive Vice President, received $12,089,727 and J. Mark Lester received $7,772,743 for a combined total of $36,229,375.

53.     In contrast, during 2007 Defendant McClendon received $18,764,484 while that same year Rowland ($12,336,572), Dixon ($5,031,094), Jacobson ($5,996,631) and Lester ($9,398,891) combined to earn $32,763,188.

54.     The amount of compensation Defendant McClendon received in 2008 becomes even more outrageous when compared to top executives at other publically traded oil/gas companies. The financial website finance.yahoo.com lists Chesapeake's direct competitors as BP plc, Anadarko Petroleum Corporation and ConocoPhillips.

According to a *Reuters* article dated March 5, 2010, BP plc paid its then-CEO Tony Hayward approximately $4.3 million in 2008. According to the Definitive 14A filed with the SEC by Anadarko Petroleum Corp. on March 27, 2009, its CEO James T. Hackett earned $21,336,877 in total compensation for 2008 and $14,997,941 in 2007. According to the Definitive 14A filed with the SEC by ConocoPhillips, it paid J.J. Mulva, its CEO and Chairman of the Board, total compensation of $ 29,391,987 in 2008 and $50,549,026 in 2007.

55.    It is apparent from the statistics that Defendant McClendon went from making less in 2007 than the CEOs of Chesapeake's closest competitors, to more than 4 times that of the second highest paid CEO.

### Chesapeake's Board Breached Their Fiduciary Duties

56.    In 2008, Chesapeake's Compensation committee consisted of Defendants Keating, Maxwell and Whittemore.

57.    Chesapeake's current Compensation Committee Charter has been in effect since December 15, 2006. Pursuant to the Compensation Committee's Charter, the members are obligated to, *inter alia* "Review and approve corporate goals and objectives relevant to CEO compensation, evaluate the CEO's performance in light of those goals and objectives, and set the CEO's compensation level based on this evaluation[.]"

58.    For 2008, the Compensation Committee acknowledged that Defendant McClendon, along with Messrs. Rowland and Dixon, were responsible for "recommending base salary adjustments, cash bonuses and restricted stock awards with respect to executive officers, *including themselves,* for review, discussion and approval

by the Compensation Committee at its regularly scheduled meetings in June and December of each year." (emphasis added).

59.     The Company's Definitive Proxy of April 30, 2009, further reveals that the Compensation Committee did not seek outside guidance before approving the dramatic salary increase for Defendant McClendon. Instead, the Compensation Committee met in December and approved the new employment agreement, including the enormous increase in bonus compensation for McClendon, in just a single day.

60.     Likewise, the Audit Committee was obligated to review the purchase of Defendant McClendon's personal art collection. At the time of the purchase, the Audit Committee consisted of Defendants Kerr, Davidson, Hargis, and Miller. These Audit Committee Defendants breached their fiduciary duties to the Company and its shareholders by failing to "review insider or affiliated party transactions or courses of dealing." The Board acknowledged that it failed to employee any disinterested expert to determine the value of the artwork purchased from Defendant McClendon.

**The Board Resisted Shareholder Demands To Strengthen Corporate Governance**

61.     In 2009, shareholders overwhelmingly approved a resolution requiring nominees to Chesapeake's Board of directors to receive a majority of shareholder votes to be appointed as director. The Board, after initially recommending shareholders vote against the proposal, have to date refused to implement such a requirement.

62.     Similarly, at the 2010 annual shareholder meeting shareholders approved proposals to prohibit Company executives from trading Chesapeake stock on margin and to require shareholder advisory votes on executive compensation. The Definitive Proxy

- 19 -

filed with the SEC by Chesapeake on April 30, 2010 included shareholder statements in support of both proposals expressly referenced the excessive compensation awarded to Defendant McClendon by the Board in 2008 as a motivating factor for the proposed changes. Predictably, and unfortunately for Chesapeake shareholders, the Board recommended against both proposals. According to the results of the shareholder vote announced by the Company in a Form 8K filed with the SEC on June 17, 2010, shareholders rejected the proposal to prohibit executives from participating "in derivative or speculative transactions involving the Company's stock" but approved two proposals calling for shareholder advisory votes as to executive compensation. However, the Board did not enact that proposal.

63.     In advance of Chesapeake's 2011 annual shareholder meeting, Institutional Shareholders Services recommended investors vote against the reelection of Defendants McClendon and Nickels in part due to their "apparent unresponsiveness . . .to the shareholder franchise" and for failing to "address significant compensation issues" including the wasteful compensation provided to Defendant McClendon in 2008.

### DERIVATIVE AND DEMAND ALLEGATIONS

64.     Plaintiff brings this action derivatively in the right and for the benefit of Chesapeake to redress injuries suffered, and to be suffered, by Chesapeake as a direct result of the breaches of fiduciary duty, abuse of control, and unjust enrichment, gross mismanagement, and waste of corporate assets as well as the aiding and abetting thereof, by Defendants. Chesapeake is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would

not otherwise have.

65.    Plaintiff will adequately and fairly represent the interests of Chesapeake in enforcing and prosecuting its rights, and he has retained counsel experienced in litigating this type of action.

66.    Plaintiff is and was an owner of the stock of Chesapeake during times relevant to Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

67.    Based on the events described above, on June 9, 2010, Plaintiff, through his counsel, issued a demand (the "Demand") on the Board to take appropriate action to implement the shareholder proposals approved at the 2009 shareholder meeting along with any shareholder proposals ultimately approved at the 2010 shareholder meeting. At the time of the Demand, several compensation-related shareholder proposals had been made, which the Company recommended shareholders vote against in the Definitive Proxy statement filed with SEC on April 30, 2010.  In subsequent voting, shareholders approved two measures calling for shareholder advisory votes to be held each year regarding executive compensation.  A true and correct copy of Plaintiff's Demand is attached hereto as Exhibit "1".

68.    Plaintiff's Demand also included a request for the Board to impanel an independent committee of Board members to review the conduct of Board as a whole, including Defendant McClendon, and to seek restitution for any breaches of fiduciary duty that the panel determined had occurred in connection with Defendant McClendon's 2008 compensation package.

69.     On June 29, 2010, Plaintiff's counsel received a response to the Demand from Jennifer M. Grigsby, Chesapeake's Senior Vice Present, Treasurer and Corporate Secretary, in which she referred to ongoing legal matters involving the Company relating to, *inter alia,* Defendant McClendon's 2008 compensation. Ms. Grigsby indicated the Demand would be sent to the Audit Committee for further review, but she provided none of the information Plaintiff specifically requested in the Demand nor did the response address any of Plaintiff's numerous concerns. A true and correct copy of Ms. Grigsby's letter to Plaintiff's counsel is attached hereto as Exhibit "2".

70.     On August 4, 2010, Plaintiff, through his counsel, wrote Ms. Grigsby further demanding the Board take steps to remedy the wrongs identify in the Demand. Plaintiff demanded the Board within 60 days act on the shareholder proposals approved by a majority of the shareholders and to form a special committee to investigate the circumstances surrounding Defendant McClendon's 2008 compensation package. A true and correct copy of Plaintiff's counsel's letter to Ms. Grigsby is attached hereto as Exhibit "3".

71.     On September 7, 2010, Ms. Grigsby again responded to Plaintiff's counsel by letter. Ms. Grigsby deferred issues raised by Plaintiff in his letter by stating Audit Committee would review the August 4 letter at its next meeting, while noting recent changes in Oklahoma law made implementation of certain shareholder proposals unlawful. Specifically, the Oklahoma General Corporation Act was amended as of September 1, 2010, to require companies with more than 1000 shareholders to maintain staggered boards, whereas Chesapeake shareholders previously voted in favor of annual

election of directors. A true and correct copy of Ms. Grigsby's letter to Plaintiff's counsel is attached hereto as Exhibit "4".

72. On October 13, 2010, Ms. Grigsby again wrote to Plaintiff's counsel regarding Plaintiff's previous demand. Ms. Grigsby represented that the Audit Committee reviewed Plaintiff's Demand and follow-up letter and that it was "deferring further action pending developments" in other litigation regarding, in part, Defendant McClendon's 2008 compensation. Ms. Grigsby also noted again the change in Oklahoma's General Corporation Act requiring staggered Board memberships, and finally pointed Plaintiff's counsel to Chesapeake's 2010 proxy statement wherein the Company provided a rationale for refusing to implement shareholder proposals to require directors sitting for election to receive a majority of votes cast. A true and correct copy of Ms. Grigsby's letter to Plaintiff's counsel is attached as Exhibit "5".

73. Via letter dated December 2, 2010, Plaintiff, through his counsel, responded to Ms. Grigsby's letters of September 7 and October 13, 2010. Plaintiff's counsel noted that the Board's deferral of Plaintiff's demand was a tacit rejection of that Demand, according to case law cited previously by Ms. Grigsby, and that this rejection occurred without the Board having taken steps necessary to adequately inform itself of the circumstances underlying the allegations. Plaintiff then demanded certain information, including relevant documents, be made available to him such that he could assess what efforts, if any, had been made by the Board in assessing his Demand. Plaintiff even identified certain documents directly related to his request. A true and correct copy of Plaintiff's letter is attached hereto as Exhibit "6".

74.     Finally, on December 20, 2010, Ms. Grigsby wrote Plaintiff's counsel stating the Company would not provide the documents or information requested at that time. Instead, the Audit Committee determined to continue to defer its consideration of Plaintiff's Demand "pending further developments in the derivative litigation on the same subject matter." Ms. Grigsby stated the Audit Committee had reviewed "voluminous information" not included in the itemized list of documents Plaintiff requested be made available to him to assist in his review of the Board's conduct in response to his Demand. Most if not all of the information allegedly reviewed by the Board dealt with issued raised in other pending derivative litigation. A true and correct copy of Ms. Grigsby's letter is attached hereto as Exhibit "7".

75.     The information allegedly reviewed by the Audit Committee consisted primarily of legal filings made in a derivative suit which alleged the Board breached its fiduciary duties to Chesapeake and its shareholders, and that any demand on the Board would be futile and thus was excused, because the Board could not independently review and act on the allegations. The Board argued in that case, successfully, that it was entitled to conduct/direct any litigation relating to Defendant McClendon's 2008 compensation. However, when presented with a demand to act in a manner consistent with that position, the Board "deferred" that consideration.

76.     A board of directors cannot sit idly by when presented with a shareholder demand. Board neutrality constitutes a waiver of the demand requirement. Here, Chesapeake's Board deferred consideration of Plaintiff's Demand and thus waived the demand requirement all together.

- 24 -

77.    Conversely, by failing to fully inform itself of the allegations underlying the Demand the Board has in effect wrongfully rejected it. Ms. Grigsby's responses to Plaintiff and his counsel demonstrate that the Board had not performed an adequate investigation into the Demand beyond relying on the efforts made in connection with a different lawsuit. This is simply insufficient as the Company's defense of the pending litigation and its response to Plaintiff's Demand are unique issues. In the litigation, the Board argued it was sufficiently independent and disinterested to assess a shareholder demand in connection with, among other things, Defendant McClendon's 2008 compensation. Yet, the Audit Committee has not retained outside counsel or any consultants to investigate the allegations other than those efforts made in connection the "demand-excused" litigation. Further, the Board has never produced any reports evaluating the underlying claims of breaches of fiduciary duty and corporate waste

78.    The Audit Committee has provided Plaintiff no details as to what developments in the now-dismissed "demand-excused" litigation would be sufficient for the deferral of consideration of Plaintiff's Demand to end. This failure to provide such details creates a situation where Plaintiff, who made a good-faith shareholder demand to remedy corporate wrongs, is left with no reason to believe the Chesapeake Board of Directors will act to even investigate the underlying allegations in his Demand. In fact, the Board's actions to date – from approving Defendant McClendon's personal bailout, to rejecting shareholder initiatives relating to executive compensation, to moving to dismiss "demand-excused" derivative litigation on standing grounds, to delaying and "deferring" consideration of a valid shareholder demand- all demonstrate the Board is not inclined to

act in the best interest of Chesapeake shareholders.

79.    The Board, through its conduct in response to Plaintiff's Demand, has either waived the demand requirement or tacitly rejected the Demand without adequately informing itself.   In either situation, Plaintiff is legally entitled to pursue the claims contained herein.

80.    Upon filing this action, Plaintiff has waited more than 14 months for the Board to act on his Demand, yet they have failed to do so.   Because of this unreasonable delay, Plaintiff is now forced to bring this action in light of the approaching expiration of the statute of limitations.

## COUNT I
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

81.    Plaintiff incorporates by reference and realleges the allegations contained above, as though fully set forth herein.

82.    Defendants owed and owe Chesapeake fiduciary obligations, including the highest obligation of good faith, fair dealing, loyalty and due care.

83.    Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

84.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Chesapeake has sustained significant damages.  As a result of the misconduct alleged herein, the Defendants are liable to the Company.

85.    Each member of the Relevant Board served on Chesapeake's Board of Directors in 2008 and caused Chesapeake, or allowed other members of the Board to

cause Chesapeake, to provide Defendant McClendon a personal financial bailout that placed his individual interests above that of the Company and its shareholders.

86.    Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

## COUNT II
## AGAINST THE COMPENSATION COMMITTEE DEFENDANTS FOR WASTE OF CORPORATE ASSETS

87.    Plaintiff incorporates by reference and realleges the allegations contained above, as though fully set forth herein.

88.    As a result of the misconduct described above, the Compensation Committee Defendants breached their fiduciary duties to Chesapeake by failing to properly consider the interests of the Company and its public shareholders when approving a compensation package for Defendant McClendon, which was excessive and inconsistent with the financial results to the Company achieved in 2008.

89.    As a result of these breaches of fiduciary duty, each Compensation Committee Defendants, all of whom owed Chesapeake fiduciary duties, are liable to the Company.

## COUNT III
## AGAINST THE AUDIT COMMITTEE MEMBERS FOR WASTE OF CORPORATE ASSETS

90.    Plaintiff incorporates by reference and realleges the allegations contained above, as though fully set forth herein.

91.    As a result of the misconduct described above, the Audit Committee Defendants breached their fiduciary duties to Chesapeake by approving the Company's purchase of Defendant McClendon's personal art collection for $12.1 million.    As

members of the Audit Committee, the Audit Committee members were obligated to review insider transactions. Instead of complying with their fiduciary duties, the Audit Committee Defendants "rubberstamped" the purchase of Defendant McClendon's personal art collection without adequate due diligence.

92.     As a result of this breach of fiduciary duty, each of the Compensation Committee Defendants, all of whom owed Chesapeake fiduciary duties, are liable to the Company.

**COUNT IV**
**AGAINST DEFENDANT MCCLENDON FOR UNJUST ENRICHMENT**

93.     Plaintiff incorporates by reference and realleges the allegation set forth above, as though fully set forth herein.

94.     By his wrongful acts, Defendant McClendon was unjustly enriched at the expense of and to the detriment of Chesapeake. Defendant McClendon was uniquely positioned to influence the personal compensation paid to him in 2008 by Chesapeake, and he took advantage of that position by recommending the Board approve a compensation package for him that was in his own best interest and not the best interest of Chesapeake or its shareholders.

95.     Plaintiff, as a shareholder and representative of Chesapeake, seeks restitution from Defendant McClendon, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by him from his wrongful conduct and fiduciary breaches.

## COUNT V
## AGAINST ALL DEFENDANTS FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

96.     Plaintiff incorporates by reference and realleges the allegation contained above, as though fully set forth herein.

97.     Defendants owed and owe Chesapeake fiduciary obligations. By reason of their fiduciary relationships, Defendants specifically owed and owe Chesapeake the highest obligation of good faith, fair dealing, loyalty and due care.

98.     Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

99.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Chesapeake has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

100.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

101.    Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

## COUNT VII
## AGAINST ALL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

102.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

103.    As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Chesapeake to incur (and Chesapeake may continue to incur) significant legal

- 29 -

liability and/or legal costs to defend itself as a result of Defendants' unlawful actions.

104.   As a result of this waste of corporate assets, Defendants are liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.   Directing Chesapeake to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, enacting the shareholder proposals approved by a majority vote to amend the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary, to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies of executive compensation and guidelines of the Board;

C.   Awarding to Chesapeake restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.   Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  September 8, 2011.

Respectfully submitted,

s/ Kenyatta R. Bethea
**HOLLOWAY, BETHEA & OSENBAUGH**
Kenyatta R. Bethea, OBA# 18650
3035 N.W. 63rd, Suite 102N
Oklahoma City, OK 73116
Telephone: (405) 246-0600
Facsimile:  (405) 246-0601
kbethea@hbolaw.com

-and-

**HOLZER HOLZER & FISTEL, LLC**
Michael I. Fistel, Jr.
Marshall P. Dees
200 Ashford Center North, Suite 300
Atlanta, Georgia 30338
Telephone:   770-392-0090
Facsimile:    770-392-0029